2011 UT App 66

Judy M. PRICE, Plaintiff and Appellant,

v.

SMITH'S FOOD AND DRUG CENTERS, INC.; Pyggy, Inc., dba Market Source West; and John Does I–V, Defendants and Appellees.

No. 20090397–CA.

Court of Appeals of Utah.

March 10, 2011.

Tyler S. Young, Provo, for Appellant.

Todd C. Hilbig and Stephen F. Edwards, Salt Lake City, for Appellees.

Before Judges McHUGH, THORNE, and VOROS.

## OPINION

VOROS, Judge:

¶1 Judy M. Price slipped and fell on a puddle of water in a Smith's Food & Drug Centers, Inc. grocery store located in American Fork, Utah. Price filed suit against Smith's and Pyggy, Inc., dba Market Source West (Pyggy), alleging negligence and seeking damages for injuries to her arm, hip, and back. The trial court entered summary judgment in favor of Smith's. Price appeals that ruling.[1] We affirm in part, reverse in part, and remand for further proceedings.

## BACKGROUND

¶2 On April 2, 2005, the customers of Smith's American Fork store were treated to free samples of meat and cheese by Pyggy, a food demonstrator. Pyggy's employee Steven Tyler distributed the samples at a table he had set up in the store. Pyggy was paid by a third-party vendor of deli meats and cheeses. Smith's did not supervise or control how Pyggy operated its demonstration table, nor did it provide Pyggy with free food samples. Tyler disassembled his demonstration table at around 4:40 p.m. and left Smith's by about 5:00 p.m. Around that same time, Price arrived at Smith's with her granddaughter to buy strawberries. Upon leaving the produce section, Price slipped on a puddle of water about eight inches in diameter. She fell to the floor, suffering injuries.

¶3 Before Price fell, no one was aware of the puddle. In his deposition, Chuck Brown, the store manager, stated that he was "almost 100 percent sure" that the water came from Tyler's table because the puddle "was in the exact same spot where that [demonstration] table was that [Tyler] had set up." Brown also noted that he had seen a cup of water at the table and that he was "sure that [the] water belonged to" Tyler. However, Tyler, with equal conviction, stated that he did not have water at his table that day, and that it would pose a food safety risk.

---

1. Price had difficulty locating and serving Pyggy, a Nevada corporation, which had apparently dissolved by the time Price filed suit. Price and Smith's continued the litigation.

¶ 4 Precisely how long the water was on the floor is unclear. Basing his estimate on his belief that Tyler was the source of the spill, Brown estimated that "it couldn't have been [there] too long . . . maybe ten minutes, maybe tops, if that." Price had "no idea" how long the water had been there, but thought she fell at "5 something, 5:20, 5 something." Brown thought that Price fell at "about five o'clock p.m." or "a little bit after that, a few minutes." Smith's has a formal policy of inspecting its floors for temporary hazards at least once every hour. The afternoon of Price's fall, Smith's employees conducted floor inspections at 4:24 p.m., 4:26 p.m., 4:29 p.m., 4:33 p.m., 4:43 p.m., 4:50 p.m., 5:12 p.m., and 5:38 p.m. None revealed the water.

¶ 5 Price filed suit against Smith's and Pyggy alleging various theories of negligence. The theories relevant to this appeal are a direct liability theory based on the store's failure to maintain the premises in a reasonably safe condition and a vicarious liability theory based on Pyggy's negligence. Smith's filed a motion for summary judgment, which the trial court granted. First, the court ruled that Price could not show that Smith's had actual or constructive notice of the water, because Price presented no evidence of the length of time the water was on the floor. Second, the court rejected Price's theory of direct liability based on the existence of the food demonstrator. Finally, the court ruled that Smith's could not be liable under a vicarious liability theory, because Pyggy and Tyler were not employees or agents of Smith's. Price appeals.

## ISSUES AND STANDARDS OF REVIEW

¶ 6 Price contends that the trial court erred when it determined that she "presented insufficient evidence of the length of time the puddle was on the floor." Price further contends that Smith's delegated an "absolute duty" to Pyggy and, thus, notwithstanding the fact that Pyggy and Tyler were not employees or agents of Smith's, the trial court erred when it determined that Smith's could not be vicariously liable for the acts of Pyggy.

¶ 7 Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). We "review[ ] a trial court's legal conclusions and ultimate grant or denial of summary judgment for correctness and view[ ] the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Bingham v. Roosevelt City Corp.*, 2010 UT 37, ¶ 10, 235 P.3d 730. In addition, "because negligence cases often require the drawing of inferences from the facts, which is properly done by juries rather than judges, summary judgment is appropriate in negligence cases only in the clearest instances." *Matheson v. Marbec Invs., LLC*, 2007 UT App 363, ¶ 5, 173 P.3d 199 (internal quotation marks omitted).

## ANALYSIS

### I. Direct Liability

¶ 8 "The mere presence of a slippery spot on a floor does not in and of itself establish negligence." *Silcox v. Skaggs Alpha Beta, Inc.*, 814 P.2d 623, 624 (Utah Ct. App.1991). "[P]roperty owners are not insurers of the safety of those who come upon their property, even though they are business invitees." *Martin v. Safeway Stores, Inc.*, 565 P.2d 1139, 1140 (Utah 1977). Instead, a business owner " 'is charged with the duty to use reasonable care to maintain the floor of his establishment in a reasonably safe condition for his patrons.' " *Jex v. JRA, Inc.*, 2008 UT 67, ¶ 25, 196 P.3d 576 (quoting *Schnuphase v. Storehouse Mkts.*, 918 P.2d 476, 478 (Utah 1996)).

¶ 9 Premises liability cases generally fall into two classes: those involving temporary conditions and those involving permanent conditions. *See Allen v. Federated Dairy Farms, Inc.*, 538 P.2d 175, 176 (Utah 1975). The first class "involves some unsafe condition of a *temporary* nature, such as a slippery substance on the floor and usually where it is not known how it got there." *Id.* "The second class of cases involves some unsafe condition of a *permanent* nature, such as: in the structure of a building, or of a stairway, etc...., which was created or cho-

sen by the defendant (or his agents), or for which he is responsible." *Id.* The second class also includes cases where the storeowner's method of operation creates a situation where the reasonably foreseeable acts of third parties will create a dangerous condition. *See Canfield v. Albertson's, Inc.,* 841 P.2d 1224, 1226 (Utah Ct.App.1992).

¶ 10 Under the temporary unsafe condition theory, a plaintiff must show that "(1) the defendant 'had knowledge of the condition, that is, either actual knowledge or constructive knowledge because the condition had existed long enough that he should have discovered it'; and (2) 'after [obtaining] such knowledge, sufficient time elapsed that in the exercise of reasonable care he should have remedied it.'" *Jex,* 2008 UT 67, ¶ 16, 196 P.3d 576 (alteration in original) (quoting *Allen,* 538 P.2d at 176). However, this notice requirement does not apply " 'if the [unsafe] condition or defect was created by the defendant himself or his agents or employees.' " *Id.* (alteration in original) (quoting *Long v. Smith Food King Store,* 531 P.2d 360, 361 (Utah 1973)).

¶ 11 On appeal, Price advances two theories of direct liability. Both theories rely upon a temporary unsafe condition analysis. First, Price argues that summary judgment was improper because a genuine issue of material fact exists as to whether Smith's had constructive knowledge of the puddle. Second, she contends that she need not prove either actual or constructive knowledge. Smith's policy of not checking the demonstration area after Pyggy left, she argues, constitutes negligence because "demonstrat[ion] areas are typical areas to anticipate spillage." Price was prepared to offer expert testimony to that effect.

A. Direct Liability Based on Constructive Knowledge

¶ 12 Price's first argument on appeal is a classic temporary unsafe condition claim. Price acknowledges that Smith's lacked actual knowledge of the puddle, but argues that Smith's had constructive knowledge of it " 'because the condition had existed

long enough that [Smith's] should have discovered it.' " *Jex,* 2008 UT 67, ¶ 16, 196 P.3d 576 (quoting *Allen,* 538 P.2d at 176). "To establish that a temporary condition existed long enough to give a store owner constructive knowledge of it, a plaintiff must present evidence that 'would show . . . that [the condition] had been there for an appreciable time.' " *Id.* ¶ 19 (quoting *Ohlson v. Safeway Stores, Inc.,* 568 P.2d 753, 754 (Utah 1977)).[2] Our courts have thus "imputed constructive notice to a store owner only when there is some evidence of the length of time the debris has been on the floor." *Id.* Conversely, where "conjecture and speculation [are] the only way[s] to determine the length of time [a substance] was on the floor," constructive notice should not be imputed. *Id.* ¶ 21.

¶ 13 For instance, in *Ohlson v. Safeway Stores, Inc.,* 568 P.2d 753 (Utah 1977), the Utah Supreme Court held that the plaintiff presented sufficient evidence that the owner had constructive knowledge of spilled spaghetti because the spaghetti "was dirty, crushed, broken into small pieces, and . . . extended from aisle ten around the end of that aisle into the main aisle for five or six feet toward the cash register at the front of the store." *Id.* at 754. In contrast, the plaintiff in *Jex v. JRA, Inc.,* 2008 UT 67, 196 P.3d 576, did not present sufficient evidence of constructive knowledge. There, the plaintiff slipped on a puddle of water in the defendant's store. *See id.* ¶ 1. The plaintiff was the defendant's first customer on the morning of the incident and the fourth person to walk into the store. *See id.* ¶¶ 2–3. To prove that the defendant had notice of the puddle, the plaintiff relied on the fact that the defendant's employees shoveled snow that morning and wore boots with deep treads. *See id.* ¶ 21. The plaintiff argued that the defendant's employees were therefore likely to have tracked snow into the store, thus causing the puddle. *See id.* The supreme court noted that, while that evidence helped show "who created the puddle," it did little to establish "how long [the water] had been there." *Id.* The court held that the

**2.** *Appreciable* means "capable of being perceived and recognized or of being weighed and ap-

praised." Webster's International Dictionary 105 (3rd ed. 1986).

plaintiff's evidence was inadequate to prove constructive notice because there was "no evidence regarding the amount of time the unsafe condition [had] existed." *Id.* ¶ 19.

¶ 14 In light of these principles, the trial court concluded here that Price had shown "no evidence" of the length of time the puddle was on the floor before Price's fall. However, Price presented the following evidence of the length of time the puddle was on the floor: (1) Smith's stated in an interrogatory answer that "[t]he water on the store's floor came from a cup of water that Stephen Tyler ... spilled and failed to clean up before leaving the store premises shortly before [Price's] alleged accident"; (2) Brown, the store manager, testified that he was "almost 100 percent sure" that the water came from Tyler's demonstration booth; (3) the water was in the same place that Tyler's demonstration booth had been; (4) Tyler left Smith's by at least 5:00 and, most likely left the demonstration area minutes earlier; (5) Price testified that she slipped between 5:00 and 5:20; (6) Brown estimated that the water was on the floor "maybe ten minutes, maybe tops, if that"; and (7) no floor inspections occurred between 4:50 p.m. and 5:12 p.m.

¶ 15 Comparing the instant case to *Lindsay v. Eccles Hotel Co.*, 3 Utah 2d 364, 284 P.2d 477 (1955), Smith's argues that Price has presented "no evidence as to how long the water was on the floor" that is not based on "speculation," "conjecture," and "guesses." In *Lindsay*, the plaintiff slipped on water in the defendant's coffee shop after she had received water from her waitress. *See id.* at 478. The supreme court held that the plaintiff could not recover under a temporary unsafe condition theory because "there was no evidence as to how the water got onto the floor, by whom it was deposited, exactly when it arrived there or that the defendant had knowledge of its presence." *Id.* In contrast, Price has provided evidence of how the water got onto the floor, by whom it was deposited, and a temporal window within which it may have arrived there.

¶ 16 Price's evidence of time may also be stronger than that of the plaintiff in *Ohlson*. There, the court had to rely on the state of the substance to infer the amount of time it had been on the floor. *See Ohlson*, 568 P.2d at 755. Here, we have a clock. There is evidence that the water was left by Tyler before 5:00 and that Price slipped between 5:00 and 5:20. In addition, the floor inspections at 4:50 and 5:12 bookend the time frame in which the spill most likely occurred.

■ Even under the relatively lenient standard of showing "some evidence" that the water was on the floor for "an appreciable time," *Jex*, 2008 UT 67, ¶ 19, 196 P.3d 576, we recognize that the question before us is a close one. However, drawing all inferences in favor of Price, as we must, we conclude that Price has adduced some evidence that the water may have been on the floor for some ten to twenty-two minutes. Accordingly, Price has presented "some evidence" that the water was on Smith's floor for an appreciable length of time.[3]

■ ¶ 18 Smith's argues that an inequity will result if we consider the floor inspection log as evidence of time, because Smith's conducted the floor inspections to ensure the safety of its property. Specifically, Smith's counsel stated in oral argument that "a store should [not] be blamed and imputed constructive notice for taking an effort to make sure its floors are safe." The initial inquiry in a premises liability case involving a temporary condition focuses on how long the hazard existed. Evidence of a storekeeper's inspections is relevant to this inquiry, and Smith's points to no rule of evidence or other legal authority that would render it inadmissible. In addition, we note that the inspection log is a two-edged sword. While the log does provide evidence of knowledge, it also provides evidence of reasonable care. The question of whether the facts of this case,

---

3. Because Smith's does not argue that a time frame of ten to twenty-two minutes is not as a matter of law an "appreciable amount of time," we do not address whether it is. *But compare Schnuphase v. Storehouse Mkts.*, 918 P.2d 476, 478 (Utah 1996) (ruling that two to four minutes was insufficient as a matter of law to give constructive notice), *with Rose v. Da Ecib USA*, 259 A.D.2d 258, 260, 686 N.Y.S.2d 19 (1999 N.Y.App. Div.) (ruling that fifteen minutes was "sufficient to take the question of constructive notice to the jury").

including the inspection logs, demonstrate that Smith's did or did not exercise reasonable care is for the finder of fact and should not, in our view, be determined by excluding a class of otherwise relevant and admissible evidence. Finally, we note that at least one jurisdiction has held that "evidence of the owner's failure to inspect the premises within a reasonable period of time is sufficient to allow an inference that the condition was on the floor long enough to give the owner the opportunity to discover and remedy it." *Ortega v. Kmart Corp.*, 26 Cal.4th 1200, 114 Cal.Rptr.2d 470, 36 P.3d 11, 13 (2001) (citation omitted). *See generally Sheehan v. Roche Bros. Supermarkets*, 448 Mass. 780, 863 N.E.2d 1276, 1280–87 (2007) (surveying the "traditional," "mode of operation," and "burden-shifting" approaches to premises liability).

¶ 19 In sum, viewing the evidence in the light most favorable to Price, we conclude that Price has adduced some evidence of the length of time the water puddle was on the supermarket floor. Accordingly, we reverse the summary judgment rejecting Price's claim based on the constructive knowledge theory of premises liability.

**B.  Direct Liability Based on Store Policy Concerning Food Demonstrators**

¶ 20 In addition, Price challenges the trial court's rejection of a separate but related theory of liability. She argues that she need not prove either actual or constructive notice because Smith's did not check the demonstration area "at the moment Pyggy checked out of the store." This argument is based on the conclusion of Price's expert witness, a former health and safety manager for a chain of 1,300 supermarkets, who opined that "demonstrator areas are typical areas to anticipate spillage" and that by not checking to ensure Pyggy's demonstration area was clean, the conduct of Smith's fell below the relevant standard of care.

■ ¶ 21 Price advances this argument under the temporary unsafe condition frame-

work. However, under a temporary unsafe condition theory, with one exception, "fault cannot be imputed to the defendant so that liability results therefrom unless . . . he had knowledge of the condition, that is, either actual knowledge, or constructive knowledge." *Allen v. Federated Dairy Farms, Inc.*, 538 P.2d 175, 176 (Utah 1975). The one exception is where the temporary unsafe condition was created by the defendant or its agents, in which case "the notice requirement does not apply." *Jex v. JRA, Inc.*, 2008 UT 67, ¶ 16, 196 P.3d 576 (internal quotation marks omitted). Price does not argue here that Smith's or its agent caused the puddle of water. Rather, she urges us to adopt an additional "exception" to the traditional temporary unsafe condition analysis.[4]

¶ 22 However, we are not at liberty to adopt the innovation Price urges upon us, because our supreme court has already rejected it in *Long v. Smith Food King Store*, 531 P.2d 360 (Utah 1973). There, a grocery store customer slipped and fell on a piece of pumpkin pie seven to ten feet from where pie samples were being handed out by an in-store demonstrator. *See id.* at 361. No one knew how long the pie had been on the floor at the time of the accident. *See id.* The plaintiff acknowledged the line of cases requiring actual or constructive knowledge in such situations, but argued that, irrespective of the storekeeper's lack of knowledge of the particular hazard that caused the fall, "the giving out of these samples of pie in that manner had inherent dangers because of the likelihood of its being dropped on the floor." *Id.* Thus, he argued, "the standard of ordinary and reasonable care would require the defendant to exercise greater precautions than it did to protect its customers." *Id.*

¶ 23 Our supreme court rejected this approach and adhered to the line of cases holding that a plaintiff is required to demonstrate that a defendant "knew, or in the exercise of due care should have known, that the foreign substance was present for sufficient time that in due care it should have been removed."

---

4.  Although neither party uses the term, Price in effect asks us to rule that supermarkets have a specific duty to inspect demonstration areas after food demonstrators leave. *See generally Yazd v.*

*Woodside Homes Corp.*, 2006 UT 47, ¶ 14, 143 P.3d 283 (noting that the existence of a legal duty in tort is a question of law for the court to determine).

*Id.* at 362. The court concluded that the giving away of samples "is a well known and widely practiced method of merchandising and we see no reason why the same rules should not apply as to the other operations of the market." *Id.* It likewise saw no reason why "such a promotional activity should itself impose a duty of extra caution." *Id.*

¶ 24 Two years after *Long,* our supreme court again declined to adopt a food demonstrator exception over a spirited dissent in *Allen v. Federated Dairy Farms, Inc.,* 538 P.2d 175 (Utah 1975). There, the majority rejected the argument that when a supermarket allowed demonstrators to distribute cottage cheese "without the protection of a container, and without a procedure for inspection and clean-up[,] they undertook a commensurately higher duty of care, to protect patrons from the increased hazards which were reasonably foreseeable." *Id.* at 178 (Maughan, J., dissenting).

¶ 25 Thus, in both *Long* and *Allen,* our supreme court refused to carve out a special exception for foreseeable dangers created in supermarkets by food demonstrators. It refused to do so despite the fact that the plaintiffs in those cases both slipped on the product being sampled, an event at least as foreseeable as a customer slipping on an unrelated substance left by a food demonstrator, such as the water in this case. Consequently, we conclude that the trial court properly ruled that, notwithstanding expert testimony of industry practice, a claim based on a temporary unsafe condition requires proof either that Smith's created the unsafe condition or that Smith's had actual or constructive knowledge of it.

## II. Vicarious Liability

¶ 26 Finally, Price contends that the trial court erred in granting summary judgment under her vicarious liability theory because Smith's "delegated the duty to clean its floor" to Pyggy and that the duty was nondelegable. Generally, an employer is not liable to third persons for the torts of an independent contractor. *See Magana v. Dave Roth Constr.,* 2009 UT 45, ¶ 22, 215 P.3d 143 ("Utah adheres to the general common law rule that the employer of an independent contractor is not liable for physical harm caused to another by an act or omission of the contractor or his servants." (internal quotation marks omitted)). "One exception is that [the] owner of the premises ... [has] a nondelegable duty to keep the premises reasonably safe for business invitees." *Sullivan v. Utah Gas Service Co.,* 10 Utah 2d 359, 353 P.2d 465, 466 (Utah 1960) (citing Prosser on Torts 359 (2d ed. 1955); 2 Harper & James, The Law of Torts, § 26.11, at 1406; Restatement (Second) of Torts, § 422 (additional citation omitted)). The owner may thus be found liable if it delegates that duty to an independent contractor, who then breaches it. *See id.; see also* 41 Am.Jur.2d *Independent Contractors* § 45 (2005) ("Store operators and other business owners have a nondelegable duty to the public to keep their place of business in a reasonably safe condition and free from danger of personal injury."). "A 'nondelegable duty' means that an employer of an independent contractor, by assigning work consequent to a duty, is not relieved from liability arising from the delegated duties negligently performed." 41 Am. Jur.2d *Independent Contractors* § 43 (2005).

¶ 27 Here, Price relies on cases from other jurisdictions for the principle that a "store is liable for the tortious acts of an independent contractor when it delegates maintenance and repair activities to the contractor." For instance, Price notes that in *Lilienthal v. Hastings Clothing Co.,* 131 Cal.App.2d 343, 280 P.2d 824 (1955), and *Gill v. Krassner,* 11 N.J.Super. 10, 77 A.2d 462 (N.J.Super.Ct.App.Div.1950), store owners were held liable when customers slipped on floors that had been waxed by independent contractors. *See Lilienthal,* 280 P.2d at 828; *Gill,* 77 A.2d at 464. In both of those cases, however, the store owners had hired the independent contractors to wax the floors. *See Lilienthal,* 280 P.2d at 828; *Gill,* 77 A.2d at 464. And in *Lipman Wolfe & Co. v. Teeples & Thatcher, Inc.,* 268 Or. 578, 522 P.2d 467 (1974), another case Price cited, a customer slipped on tile that the store owner's independent contractor had installed. *See id.* at 467. But as in *Lilienthal* and *Gill,* the store owner had hired the contractor for the purpose of repairing the tile, *see id.*

¶ 28 "The fault with [Price's] contention is that it assumes a relationship not borne out by the pleadings or record." *Sullivan*, 353 P.2d at 467. Smith's did not hire Pyggy to clean, maintain, repair, or inspect its floors. In fact, Smith's did not hire Pyggy to do anything. Pyggy was retained by a third party to distribute food samples in Smith's. The store manager did testify to the effect that Smith's had a policy that food demonstration companies clean up their demonstration areas upon completing their demonstrations. This proves only that Pyggy was expected to clean up after itself. More fundamentally, Smith's does not seek to avoid liability by claiming it had delegated any duty to Pyggy. Accordingly, the trial court properly entered summary judgment against Price on the vicarious liability issue.

## CONCLUSION

¶ 29 Under the constructive knowledge theory of direct liability, Price has presented some evidence to show that the puddle of water was on the floor for an appreciable time. We accordingly reverse the trial court's ruling on this point. However, we conclude that the supreme court has foreclosed Price's food demonstrator theory of direct liability. We accordingly affirm the trial court's rejection of that theory. Also, because Smith's did not delegate an absolute duty to Pyggy, we affirm the trial court's rejection of Price's vicarious liability theory. The case is remanded for further proceedings consistent with this opinion.

¶ 30 WE CONCUR: CAROLYN B. McHUGH, Associate Presiding Judge and WILLIAM A. THORNE, JR., Judge.